The first matter before us is 17-1084, Nesbitt v. FCNH. Good morning, your honors. My name is David Miller. May it please the court, I represent the plaintiff appellant, Rhonda Nesbitt. I'd like to reserve five minutes for rebuttal. Your honors, this case involves students who went to a chain of for-profit massage schools and as part of a clinical program were made to perform over 100 hours of massage to members of the paying public. Wasn't that required in order to get a license? Excuse me, sir, were they required to get a license? In order to get a license, did you have to have a certain amount of clinical experience? You do. And how much clinical experience were they required to have? The school's program said 105 hours. I believe they were required to have somewhat less than that. What was it? Do you know? There were 13 different states involved and our clients came from approximately seven of them, the opt-ins, your honor, and it varied between the opt-in states. All right. The question presented by this appeal is whether the 10th circuit will join every other federal circuit which in the last two years has considered a similar case. That would be the 2nd, the 6th, the 7th, the 9th, and the 11th circuits have all decided cases involving student interns. Every one of those circuits, your honors, has applied what has been called the primary beneficiary test announced by the 2nd circuit in the GLAT versus Fox Searchlight pictures from a couple of years ago. When you get right down to it, there's really no difference between the GLAT test and the REICH test that we applied. There is an enormous difference and I'd be glad to label what all those different issues are, your honor. In sum, and I'll address it in the balance of my argument, but in sum, the REICH test labeled six different issues. They were set out from the Walling versus Portland Terminal case from years ago in the Supreme Court. Originally, the DOL had said these are six factors to consider and issued an opinion letter saying if you don't meet all of them, you're an employee. That was rejected by this court in REICH about 25 years ago where the court said, no, you need to apply economic realities. But here's the critical difference between what GLAT has done and what, in fact, this court did in REICH. And as REICH was applied by Judge Jackson below in the district court, Judge Jackson said I have to look at those six factors in a checklist. Now within that checklist, I'm going to look at the totality of circumstances. I'm going to look at the economic realities. But just as a lens focuses the court's attention or anyone's attention on facts, the court misused that economic reality and totality of the circumstances test. Instead of taking all of these factors, which in Marshall versus Regis existed throughout the educational context, Judge Jackson just looked at those six factors set out in REICH. And within those six factors, said he weighed the totality of circumstances and the economic realities. But all of those- I'm sorry. I'd like you to talk about what factors the court should have considered. I mean, it's one thing to talk about the labels on a test and what factors the court did consider. What didn't it consider that it should have and how should that have weighed in the court's determination? Well, there are many things that either discounted or grouped as one into one element of the six factor test.  What didn't it consider? What didn't the court consider that it should have? Well, the court didn't look at the for-profit nature of the operation. The court didn't look at the economic actual marketplace and how this company, which was making millions of dollars, $4.3 million in income, competed in the marketplace. But let me- this was summary judgment, and as I understand it, the school came forward with evidence that it, in fact, did not make a profit, that it was losing money. And I don't see that your client came forward with any evidence discounting that, showing that they actually did make a profit here. Well, Your Honor, in this age of social media, one can stamp loudly and repeatedly claim facts are one thing, but in fact, there was information in the record, substantial information in the record. It was presented as Exhibit 2. Did you have an expert who testified as to how much they made? An economic expert? I think it's fair to say there was no economic expert. There was a Rule 30b-6 witness who was deposed. That was Mr. Wharton, who was the chief financial officer, and he presented Exhibit 2 to his deposition, included, I believe, at page 331 of the plaintiff's appendix. But the bottom line was that it showed 4.3 million in income, and then, as Mr. Wharton acknowledged, he set out certain expenses that supposedly offset that. For example- But what relevance is the profit when they have to have this experience? They're not displacing anybody in the public domain. They have to do it. They're under supervision, perhaps not as much as you would like. And in GLAD, they were motion picture people. They weren't getting a license. They weren't trying to qualify for a license. They were just interns in the motion picture business. You've mentioned several issues, and I'd like to address them in turn, going backwards. I think GLAD is, in this case, inappropriate to look at the seven different factors. That was an out-of-educational institute internship. Well, I thought you said that we should use the GLAD test. The guts of GLAD- The guts of GLAD are the same as the guts of Reich. The guts of GLAD, Your Honor, is a three-factor, it's actually called three salient factors by the GLAD court. And it's what the guts of the primary beneficiary test are. The first focuses on what the intern gets in exchange for his work. The second focuses- Well, the intern, we don't have an intern here. We have a person who's seeking to be licensed. He wouldn't get nothing. He could not go into the public and start holding himself out as a masseuse. Just like in dental clinics or law clinics, Your Honor, it may be that there's a practical, it may be that some states have a practical experience requirement. If a law school set out law students with no supervision, and that's the fact of the record, the record indicates no supervision. No, that's incorrect. But a person available- The record does not reflect that. The record shows that under Colorado law, a licensed massage therapist was present in the building and supposedly supposed to be available. That wasn't what the facts indicate happened in this case. No licensed massage therapist was ever available. They were available if the person wanted them. They could have put their head out of the tent and said, hey, come over here. I hate to say this, Your Honor, but that's not accurate. In fact, the policy in the record was that each person could not leave their client and had to stay with them inside of their 8 by 10 cordoned off area. There was no opportunity to see someone. We wouldn't have to leave to call out for a person who was walking up and down the aisles. And the record- You're making a totally different case than the facts in this case. I beg to differ, Your Honor. I think Judge Jackson picked and chose facts that would have supported the finding that he made but weren't in fact in the record. Those facts as to supervision, as to availability, they are all genuine issues of fact to which there was, on material issues, to which there were genuine disputes. Let me ask you this. Under Glatt, under Reich, it requires close supervision. Under Glatt, it doesn't require close supervision. As I look at these two tests to the extent that there's any difference between them at all, it seems like the differences hurt your client, don't help your client. Number one is the very first thing we look at under the Glatt factors is whether, in this case, the student understood they wouldn't be compensated for their hours working in the clinical masseuse. It may well be, Your Honor, that that is something that the court should consider under the Glatt test. But in fact, the question under Glatt, regardless of which test this court chooses, gets down to what's the exchange between the individual student and the school. And who is the primary beneficiary during that clinical program? That's what all of these courts have looked at who have examined clinical programs. And factors such as identified in the Marshall case, where the court said, you look at all the educational factors, really is picked up by the Glatt analysis. Aren't there intangible benefits that you're not speaking of here? I understand they're not paid a wage, but there are intangible benefits, particularly for individuals who want to be a masseuse that are going to be in a service-related industry. First of all, they have to get the 100 hours or plus of time to be certified, so that's a significant benefit. And secondly, what about the benefit of just hands-on training? And I get your position about them not being supervised, but don't they get a pretty significant intangible benefit just from the time that they spend with the client, learning how to develop a client relationship with that client, which has to be somewhat difficult for a masseuse, I would think. Absolutely, Your Honor. And it's not as though what the plaintiff appellant's position is that they receive nothing whatsoever. The question is on balance, who is the primary beneficiary? But you're asking us to balance, and I don't disagree that that is ultimately what it comes down to, is a balance, but I think we have to balance some pretty significant intangible benefits as well as tangible. I think that's something that the district court can do, but in a case where there are genuine issues of material disputed facts, then as the court that ended up in the BH education case as well as the Glatt case, decided that balance in those cases weighed on behalf of the school and they were not employees. But that's the Second Circuit and the Ninth Circuit. In other cases, such as the 11th Circuit Schumann case and in the Casal case out of also the Ninth Circuit, looking at those facts, the court found that under those facts, it gave up. I just want to interrupt. You said you wanted five. You're at three minutes. I'm going to ask to reserve the rest of my time. Thank you. Good morning, Your Honors. Todd Wozniak with Greenberg Charter on behalf of the Appalese defendants in this case. Let me start by just making an observation. I think this goes to some of the questioning that came out of the panel. The test at issue in this case, and there's really not a dispute about this, is an economic realities test that applies the totality of the circumstances. Everything else that we're talking about is an analytical framework that the circuit courts have said, these are some non-exclusive factors that you might want to consider looking at as a guide to ultimately getting to the answer of what is the economic realities of this relationship. Isn't the bottom line, are they employees? Yes, Your Honor. That's exactly the bottom line. And it is true that you're looking at a number of different factors that trying to assess what's the benefit to the student as compared to what's the benefit to the school. But I would suggest to you, and certainly the 11th Circuit and the Shulman case said, there was a great deal of overlap between the Glatt factors and the Reich factors. That they're looking at the same types of issues. What's the training at stake here? Is it the kind of training you get in an educational environment or a vocational school? Well, what training were they getting? That's the really big concern here. I mean, I've looked at all these cases and certainly in similar cases where you're talking about vocational type training, they all got some training in this clinical setting. What training were they getting here? They're being put in small cubicles, essentially, with curtains. They're not allowed to come out, apparently. They're with their client. Even if there's someone present, a supervisor present, apparently there's no interaction. What kind of training is that? So what I would say to you, this is the undisputed evidence of the record. And I disagree with Mr. Miller's characterization of the evidence. But number one, he wants you to not look at the totality of the circumstances. Remember, this is a clinical component of an overall educational program. So the evidence was that the students would first be in classrooms, learning the anatomy of the body, learning the proper modalities in terms of giving massage, working on each other, working on instructors, so that by the time they start a clinic, the expectation was that they should be able to do all of the massage modalities on their own. But what if they can't? That's why a clinic manager's there. But the clinic manager's not in the room. And the evidence is that very few of the public clients filled out the survey afterwards. Nobody looked, and none of the teachers looked at the surveys. So if somebody was consistently getting just terrible survey results, it would never come to the attention of someone who's supposed to be supervising. So again, the undisputed evidence was, and again, there's a lot of disputed evidence, but the undisputed evidence was there was always a clinic manager on site at all times who was an experienced and licensed massage therapist. There were also teaching assistants on site. In the vast majority of cases, they were licensed massage therapists, or they were graduates of the school program who were working towards their license. And what you have to remember is the clinic occurred on a weekend. The very next Monday, those students are back in class. And they were expected to be covering those comments from their customers with their instructors in class. If they had a question during the clinic, the clinic manager was there to answer that. And there was testimony from a number of the plaintiffs that, in fact, on those occasions when they had a question, they were able to ask the clinic manager, get advice, and make sure that they were going about the process in the right way. That's the undisputed evidence. The disputed evidence was that the clinic managers would go by, peek in from time to time. Now, Mr. Miller's client said, I never saw that happen, and I recognize that's disputed. But the key here is the state has determined what level of supervision is required for this to be an educationally sound program. But that, I mean, what the state of Colorado decides is the standard for an educational experience doesn't necessarily translate to what supervision is necessary under one of these balancing tests. Well, what I would suggest to you is that balancing test talks about the educational benefit to the student. Now, they didn't offer any expert testimony about what the educational benefit or what the level of supervision is required for there to be an educational benefit. But what we do know is that the state licensing authority and the accrediting agencies that decision. And it is undisputed that we have been continuously accredited and licensed throughout. And that fact alone tells you that the state has determined that there is, in fact, a sound educational benefit to this clinic and certainly enough for these folks to get credit for those hours towards their diplomas and ultimately credit towards their licenses. This is a balancing test, right? It is, Your Honor. And we compare benefits. So isn't it important for us to know whether your client was making a huge profit off of these massages? I think it is a factor. It is certainly not the sole factor. But can you come to a result here without knowing what the answer is to that? Well, the only evidence in the record is the evidence that the defendants put in the record. And that is that, in fact, if you were to look at these schools or these clinics, rather, on a stand-alone basis, they do not make money. They lose money, if anything. Well, you know, and I understand that is the evidence. I also understand that you, in your expert calculating that, took all of the overhead of running the school and included that, but didn't include any tuition in that calculation, which seems like a pretty fertile ground for cross-examination if this had gone to trial. Well, certainly you could make that argument. And they've made arguments that if you take this out or take that out, it reduces the profitability. But nowhere have they shown it would be profitable if you change these figures. The figures were that there was about $3 million in revenue coming in from the paid massage customers. The $3 million, though, included the revenue. I'm sorry. Your figures about, I think you had figures about a $3 million loss, right? Yes. Right. But that factor, as Judge McHugh indicated, took into account a very substantial prorated expense versus just the marginal expenses, which would be appropriate. So those figures, to me, are not particularly valid. Well, but what the figures are that are the marginal expenses is there was over $2 million for the clinic managers, the TAs, and the other staff that were dedicated solely to the clinics. But you are arguing that this is part of their education, and yet you didn't include in that calculation tuition. You didn't prorate part of the tuition in making that calculation. That seems to me glaring error in calculating profit on the clinics. Well, what the evidence was is that but for this clinical requirement, we wouldn't use these classrooms for clinic at all. It's more profitable to have than the classroom training sessions. And so the folks doing this calculus felt it was appropriate because you're going to have a proportional amount of the rent, the utilities, the electricity, the heat that is going to be used for this clinic. Because if we weren't using it for the clinic, we'd either be having classrooms there or we'd shut the building down for the weekend. And so that's what they took into account. But what I would say to you is Judge Jackson made the decision that he thought it was a disputed fact issue. And he said, maybe they make a little bit of profit. Maybe they don't. It's close call. But I still don't think that is enough when you look at the totality of the circumstances that whether they make a profit or not is enough to change the balance in terms of finding these folks to be students. And I think that's the right outcome. Judge Jackson, also, in applying the Wrike test, we have required that you balance factor two against factor four, two being training is for the benefit of the trainee and four being the employer that provides the training derives no immediate advantage from the activities of the trainee. And because Judge Jackson just said, well, this is disputed, he was unable to do that comparison. Is that error under the Wrike test? No. And in fact, when you look at the summary judgment oral argument, we were there for about two and a half hours. And Judge Jackson actually had a back and forth with Mr. Miller about that issue. And I think when he goes through the analysis, you've got to remember, these are guideposts. And what I'd suggest to you is that there is not a single fact and not a single argument that the plaintiff's made that Judge Jackson does not explicitly address in his summary judgment order. So the idea that he was going through the six factors like a checklist is just simply untrue. What he was doing, again, was using that as an analytical framework. And in the order itself, he says, I recognize that now that I've gone through the analytical framework, I'm still supposed to be looking, and I think he said the forest, not just the trees, and looking at the totality of the circumstances. And Mr. Miller and the plaintiffs argued is one example that the advertisements for the clinic were misleading. OK, well, that's not a factor that shows up in any of these tests. But it was a fact that the plaintiffs thought was relevant. And Judge Jackson explicitly addressed it. And so, again, when you get away from this notion. Why wouldn't that be relevant to whether they're more of a profit motive than an educational motive? If you're not advertising to the public that these are students or interns or aren't you, I wouldn't use the word deceptive, but doesn't that sort of indicate that you're seeking profit more than the educational value, perhaps? Well, I don't think so. But more importantly, what Judge Jackson did find was even if it didn't explicitly say massages by students, it said you'll be getting massages at a vocational school called the Denver School of Massage Therapy. And as he said, you've got to use a little common sense. There's no way somebody reading that advertisement doesn't understand they're being worked on by an unlicensed student. And certainly when you first show up to the clinic, if there was a doubt, all doubts are over. It's crystal clear that you're being worked on by an unlicensed student. Do they sign a release indicating they understand that? I don't think they sign a release, but they certainly are told at the beginning that there's going to be unlicensed students. They're asked to fill out that comment card at the end. And they're told that that's for the benefit of the student, and they're asked to make sure they do that. And as I mentioned before, those comment cards are expected to be covered then during the classroom training in the next Monday. And so you really can't come to the conclusion that there was anything misleading about it. And that's ultimately what Judge Jackson said, is that look, the undisputed facts tell me that this has to be. You can't tell me that this is deceptive to the public. But again, more importantly, that's just argument, and it's conjecture. There was no expert testimony to say, hey, the average person receiving this would somehow be misled by it. And again, common sense tells you that they're not. Wasn't there a price differential, too, between the amount the school charged and a licensed masseuse out in the workplace? Absolutely. The testimony was that the most they charged was $25 for a massage, and that they would often give discounts, and a number of folks even received free massages. And again, you've got to remember, what they're trying to do is bring in enough people for the students to get able to work on the number of folks they need to be able to work on in order to be licensed. And Judge Kelly, I think you asked the question about 100 hours. The vast majority of the states, and the evidence of record is the vast majority of the states require the 100 hours of clinical training. Not every single state requires it, but the vast majority do. And so the schools are putting their educational program, trying to comply with the vast majority of states in which they're operating. Now, let me make this suggestion to you. In front of Judge Jackson, the plaintiffs never argued that the Regis College case, Marshall versus Regis College case, was a different standard, that it would be wrong for the district court to apply the Reich standard, that somehow there'd be a different outcome if you apply the Marshall College case. And we put in our brief, there's really no difference between the analytical framework of the two cases. Marshall College may not have flat out said, here are the six factors, and we're going to go through them one by one. But they make clear that it's a totality of the circumstances. They go through these analysis of what's the benefit. And I would argue to you that that case is even farther afield from our case in terms of the educational benefit. You had a group of RAs who were receiving some compensation for doing RA duties. There was no evidence, at least in the opinion, that the RA duties had anything to do with the diplomas or the course that the RAs were studying for. And the court still had no problem finding there was an educational benefit to the RA program, and that these folks were students, not employees. I would argue that we have a much better case than the case at issue in Marshall versus Regis College. The second thing is, again, the GLAT test. Again, below, there was no argument that the GLAT test was the test that the district court should have applied. It would be wrong for the court to apply it. Well, they specifically cited, I think it's CASAL, C-A-S-A-L, the district in Nevada case, which is pretty much essentially the same test that they're now advocating for. And they certainly did argue throughout their pleadings that it was a totality of the circumstance test and that they should not be restricted to looking at just a particular group of factors. Whatever you want to label it, I think they were advocating for the primary beneficiary test. Or something different. I would agree they argued for totality of the circumstances. What I would say to you is with the Guy case, what they're actually asking the court to do is focus on two of the six factors, ignore the other four. So even though they were saying totality of circumstances, they were actually arguing not totality of circumstances below. And your time is up. Thank you. The bottom lines are the law has been developing in this area for the last 10 years. Judge Jackson was caught within this movement of the law where he felt obligated to look at a checklist of six factors. What is incredibly ironic in this argument is during the entire lower court district court argument, the defendants were saying, look at these six factors and these six factors only. Within one of them, the benefit issue, the court talked about the economic realities and the totality of the circumstances, but only within those limited six factors. And now the appellees come to the court saying, look, he looked at a much broader range of issues. That's not what the record reflects. In the Regis case where this court said many years ago to look at all of the factors, that's essentially what the Glatt test says. The bottom line in the Glatt test, and it was set out in a case, in the Schuman case that most procedurally follows the decision in this case, quite frankly, where the district court said you lose under essentially Reich. The 11th Circuit said no, apply Glatt, make it a big picture, look at all the factors. And when the 11th, the district court did that, actually came to an opposite conclusion. That's not what we're asking this court to do, to rule for the plaintiffs on summary judgment. We're saying send it back under the right test as opposed to sticking with Reich, which will put this court in a conflict situation with the second, sixth, seventh, ninth, and eleventh circuits. The bottom line is this, and it came from that 11th Circuit decision, and it's the statement, to reduce the primary beneficiary test adopted in those cases to its essence, a court should look at all the circumstances to determine whether the relationship chiefly benefits the student of the entity for which the student is working. In the context of a for-profit school's clinical education program, that's this case. This means that the court should inquire whether a school's effort to make money from the clinic relegated the educational function of the clinic to secondary status. If a reasonable fact finder could go either way, the court should deny summary judgment and allow a jury to decide. And we're saying to the court, that's exactly what should happen in this case. The court should reaffirm its commitment to the totality of all circumstances, not just within the six-factor right test. Use a bigger Marshall-explained look at all the evidence the law has developed since Marshall and take those three salient factors from Glatt. Was Glatt right to look at seven factors? Maybe in an outside clinic case. Your time is up. Not here. Thank you. Thank you. We'll take this matter under advisement.